# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CHARMAINE HAMER,      )
                            )
       Plaintiff,       )
                            )     **No. 12 C 10150**
     v.                 )
                            )     **Chief Judge Rubén Castillo**
NEIGHBORHOOD HOUSING SERVICES )
OF CHICAGO and FANNIE MAE,   )
                            )
       Defendants.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Charmaine Hamer brings this action under the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, against Neighborhood Housing Services of

Chicago ("NHS") and Fannie Mae (collectively, "Defendants"), alleging age discrimination, sex

discrimination, and retaliation. Presently before the Court are Defendants' separate motions for

summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated

below, the Court grants Defendants' motions.

## RELEVANT FACTS[1]

Plaintiff is a sixty-five-year-old female, (R. 98, NHS's Rule 56.1 Resp. ¶ 1; R. 46, Pl.'s

Am. Compl. ¶ 3), who was employed by NHS, (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 2). NHS

is a nonprofit neighborhood revitalization organization that creates opportunities for people to

---

[1] The Court takes the facts from the parties' Local Rule 56.1 statements of material facts. (R. 83, NHS's Local Rule 56.1(a)(3) Statement of Material Facts ("NHS's Facts"); R. 88, Fannie Mae's Local Rule 56.1(a)(3) Statement of Material Facts ("FM's Facts"); R. 89, Pl.'s Local Rule 56.1(b)(3)(C) Statement of Material Facts ("Pl.'s Facts"); R. 90, Pl.'s Response to FM's Facts ("Pl.'s Rule 56.1 Resp. to FM"); R. 91, Pl.'s Response to NHS's Facts ("Pl.'s Rule 56.1 Resp. to NHS"); R. 98, NHS's Response to Pl.'s Facts ("NHS's Rule 56.1 Resp."); R. 99, FM's Response to Pl.'s Facts ("FM's Rule 56.1 Resp.").)

live in affordable homes throughout the Chicagoland area. (*Id.* ¶ 1.) Fannie Mae, formally known as the Federal National Mortgage Association, is a federally chartered, shareholder-owned, private corporation that provides financial products and services to low-, moderate-, and middle-income families to help them buy homes. (R. 90, Pl.'s Rule 56.1 Resp. to FM ¶ 1.) During the relevant period, Fannie Mae in partnership with NHS operated the Fannie Mae Mortgage Help Center ("MHC") located at 1 S. Wacker Drive, Chicago, Illinois. (*Id.* ¶ 2.) NHS employed all staff personnel at MHC with the exception of the Fannie Mae Site Manager and Program Manager. (*Id.* ¶ 3.)

## I. Plaintiff's Employment at MHC

Plaintiff began working for NHS as a temporary employee in 2009, and she was promoted to a full-time position as an Intake Specialist in June 2010. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 2.) As an Intake Specialist, Plaintiff was staffed at MHC. (*Id.* ¶ 5.) Upon her promotion, Plaintiff received an offer letter setting forth the terms and conditions of the position. (*Id.* ¶ 6.) The letter informed Plaintiff that the position of Intake Specialist was contingent on the renewal of a contract between NHS and Fannie Mae, and that Fannie Mae had the right to remove her from the position for any reason. (*Id.* ¶ 6.) As an Intake Specialist, Plaintiff was responsible for receiving initial calls from borrowers and obtaining the information necessary for a mortgage counselor to properly serve the borrower. (*Id.* ¶ 7.) Additionally, NHS expected Plaintiff to demonstrate regular attendance and punctuality, interpersonal skills, teamwork, professionalism, and oral communication. (*Id.* ¶¶ 9, 10.) Plaintiff understood that all of these competencies constituted NHS's expectation of her performance. (*Id.* ¶ 10.)

Plaintiff's direct supervisor at MHC was Toya Glenn, an NHS Counseling Manager/Senior Foreclosure Prevention Specialist. (*Id.* ¶ 11.) Glenn worked closely with the

Fannie Mae Site Manager and Program Manager at MHC. (*Id.* ¶ 12.) From approximately June 2010 through September 2011, Glenn worked with Site Manager Nicole Evans, and from approximately September 2011 through September 2012, Glenn worked with Site Manager Mark Green. (*Id.* ¶ 13.) During this entire period, Glenn also worked with Program Manager Erich Ludwig. (*Id.*)

## II.    Plaintiff's Performance Issues

In December 2010, Plaintiff was tardy on several occasions. (*Id.* ¶ 14.) As a result, Site Manager Evans informed Plaintiff of the expectation that everyone get to work on time and the "need for everyone to put in a full eight-hour day." (*Id.*) In April 2011, NHS Counseling Manager Glenn met with Plaintiff because she had been tardy on seven different occasions between March and April 2011. (*Id.* ¶ 15.) Plaintiff explained to Glenn that her tardiness was a result of having to take two buses and a train to get to work. (*Id.*) Glenn suggested that Plaintiff take an earlier train or bus, and Plaintiff responded that she did not "have any more time to give Fannie Mae." (*Id.* ¶ 16.) Glenn reiterated to Plaintiff NHS's expectation that she arrive to work on time, and Plaintiff confirmed that she understood this expectation. (*Id.*) Shortly thereafter, Glenn and Linda Anderson, NHS's director of Human Resources at the time, met with Plaintiff to reiterate NHS's expectations regarding attendance. (*Id.* ¶ 17.)

Plaintiff continued to arrive late to work on numerous occasions, each time identifying a reason for her tardiness. (*Id.* ¶ 18.) Plaintiff was late to work on July 18, 2011, because she took the wrong train, and on July 19, 2011, because of a rainstorm or high winds. (*Id.*) Plaintiff was late again on August 4, 8, and 9, 2011, because out-of-town guests were staying in her home. (*Id.*) However, Plaintiff previously told Glenn that she would be late on those dates and Glenn indicated that her tardiness would not be a problem. (R. 98, NHS's Rule 56.1 Resp. ¶ 5.)

3

Plaintiff was also late on September 27 and 28, 2011, and on October 4, 2011, because of changes to the train schedule. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 18.) Glenn met with Plaintiff again on October 4, 2011, to discuss Plaintiff's tardiness. (*Id.* ¶ 19.) At that meeting, Glenn reminded Plaintiff of NHS's attendance policy and warned her that she would receive a written warning in the future if her attendance issues continued. (*Id.* ¶¶ 19-20.) Plaintiff promised that she would correct her attendance issues moving forward. (*Id.* ¶ 20.) Between October 4, 2011, and March 14, 2012, the date Plaintiff's employment with NHS ended, Plaintiff was not late to work. (R. 98, NHS's Rule 56.1 Resp. ¶ 7.)

NHS was also concerned with Plaintiff's communication and interaction with others at work. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶¶ 21-24.) In July 2011, Glenn met with Plaintiff to discuss four different occasions in which Glenn felt that Plaintiff had been disrespectful or inappropriate. (*Id.* ¶¶ 21-22.) Glenn provided Plaintiff with examples from December 2010, January 2011, February 2011, and June 2011. (*Id.* ¶ 22.)

At a meeting in December 2010, Plaintiff told Glenn that she "really didn't want to hear any more about that action plan [the topic of the meeting] until they figured out how to really do it." (*Id.*; R. 83-2, Ex. B Part 1, Pl.'s Dep. at 66:18-22.) Plaintiff testified in her deposition that she intended this comment to be a joke, but she understood after her meeting with Glenn in July 2011 that Glenn found the comment to be disrespectful. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 22; R. 83-2, Ex. B Part 1, Pl.'s Dep. at 66:18-67:14.)

In January 2011, Evans expressed that she was anxious about the Counselors' production numbers for that month and told Plaintiff and her co-worker Javier Vasquez that they "really had to get on the ball . . . because . . . our numbers had been bad for December." (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 22; R. 83-2, Ex. B Part 1, Pl.'s Dep. at 73:03-06.) Plaintiff replied that she

4

was "really not concerned" about the production goals for the Counselors because the Intake Specialists' production numbers were good. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 22.) Plaintiff also told Evans that she was not concerned about what their boss Ludwig thought of the production numbers because "[she] was doing [her] job" and "that's really ya'lls . . . concern." (*Id.*; R. 83-2, Ex. B Part 1, Pl.'s Dep. at 76:03-04.)

In February 2011, Plaintiff had another exchange with Evans about deleting old client files. (R. 98, NHS's Rule 56.1 Resp. ¶ 9.) Evans told Plaintiff that she wanted to delete old files of clients who had been deactivated, and Plaintiff explained to Evans why she did not think that was a "good idea." (*Id.*) Evans did not agree with Plaintiff, and proceeded to ask her to shred the old files. (*Id.*) Plaintiff told Evans that she "would need that in writing before [she] shred a file." (*Id.*; R. 83-2, Ex. B Part 1, Pl.'s Dep. at 89:13-17.) Evans suggested that they go talk to Glenn to see how she wanted the files handled. (R. 98, NHS's Rule 56.1 Resp. ¶ 11.) Evans proceeded to tell Glenn that Plaintiff was challenging her authority, which upset Plaintiff and made her cry. (*Id.*) Plaintiff admitted in her deposition that after this conversation, she understood that Evans believed that she had been insubordinate. (*Id.*)

Finally, in June 2011, when Glenn denied Plaintiff's time off request "because it was the end of the month and [they] needed to reach [their] [production] goals," Plaintiff replied, "my work doesn't have anything to do with production goals." (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 22; R. 83-2, Ex. B Part 1, Pl.'s Dep. at 80:18-81:20.) When Glenn reiterated that she needed Plaintiff to work, Plaintiff replied that "other people take off at the end of the month and it doesn't seem like production is a consideration." (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 22; R. 83-2, Ex. B Part 1, Pl.'s Dep. at 81:20-82:07.) Glenn told Plaintiff that her comments were inappropriate, and Plaintiff apologized. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 22.)

After discussing these four instances during the July 2011 meeting, Glenn informed Plaintiff that she did not feel respected as a supervisor. (*Id.* ¶ 23.) Glenn counseled Plaintiff on the need to manage her communication, suggesting some alternative ways to say things so that they would not be taken negatively. (*Id.*) Glenn also informed Plaintiff that Ludwig was aware of the conversation that had occurred between Plaintiff and Evans in February 2011 and thought that Plaintiff was disrespectful. (*Id.* ¶ 24.) Glenn explained to Plaintiff that Ludwig wanted to remove her from MHC, but that Glenn fought for Plaintiff to remain. (*Id.* ¶ 24.) Following this July 2011 meeting, Plaintiff understood that she should discuss any concerns she had regarding the policies or procedures at MHC directly with Glenn. (*Id.* ¶ 25.)

On December 20, 2011, Plaintiff received a performance review covering the employment period of June 25, 2010, through June 25, 2011. (R. 98, NHS's Rule 56.1 Resp. ¶ 14.) In this review, Plaintiff received an overall "Manager Appraisal Score" of 3.9 out of a possible score of 5.0, and an overall rating of "Exceeds Expectations." (*Id.*; R. 89-1, Ex. 5, Performance Review at 77.) Plaintiff was assessed based on four groups of "Core Factors." (R. 89-1, Ex. 5, Performance Review at 77-81.) For the first group of Core Factors—Achievement, Productivity/Time Management, and Accountability—Plaintiff received an "Exceeds Performance Measures." (R. 98, NHS's Rule 56.1 Resp. ¶ 14.) As to the Achievement factor, Glenn noted that Plaintiff "has played an [sic] significant role in our production relating to the number of files complete[d]" and that she "managed our intake files independently for the months of January and February." (*Id.*) Glenn also noted that from January 2011 to June 2011, Plaintiff's average number of completed files "exceeded her peers." (*Id.*) Under the "Manager Summary Comments," Glenn stated that "[w]hile [Plaintiff] has exceeded the expectations in

certain areas as outlined above, [Plaintiff] needs to understand that attendance and being tactful in her communication is just as critical to her success as the other measures." (*Id.*)

### III.    The Counselor/Foreclosure Prevention Specialist Position at MHC

Plaintiff first applied for the position of Counselor/Foreclosure Prevention Specialist in October 2011, but was not selected for the position.[2] (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 26.) In early 2012, another position for Counselor/Foreclosure Prevention Specialist ("the Counselor position") opened at MHC. (*Id.* ¶ 27.) Plaintiff learned about the Counselor position on February 3, 2012, while meeting with Glenn. (*Id.* ¶ 28.) Glenn advised Plaintiff that she would not be considered for the Counselor position because Ludwig was concerned about her performance. (*Id.* ¶ 28.) Despite Glenn's feedback, Plaintiff submitted her application for the Counselor position on February 4, 2012. (*Id.* ¶ 29.) The advertised salary for the Counselor position was $42,000. (*Id.*)

Glenn and Robin Coffey, NHS's Assistant Deputy Director who is sixty years old, were responsible for selecting a candidate for the Counselor position. (*Id.* ¶¶ 30-31.) Plaintiff was considered for the Counselor position, along with two other Intake Specialists at MHC: Kade Simmons (male) and Michae Hicks (female). (*Id.* ¶ 32.) In making the promotion decision, Glenn and Coffey considered the candidates' performance as Intake Specialists, as measured by their production numbers, as well as their attitude, demeanor, and ability to work well with team members. (*Id.* ¶¶ 33, 35.)

Glenn reviewed data from Fannie Mae showing the total number of phone calls handled by each Intake Specialist in 2011. (*Id.* ¶ 34.) The data revealed that Simmons handled a total of 5,732 calls as compared to Plaintiff who handled 3,982 calls, despite the fact that Simmons did

---

[2]  Plaintiff is not alleging in this lawsuit that NHS's decision not to select her for this position was discriminatory. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 26.)

not join MHC until May 2011. (*Id.*) Additionally, the 2011 Production Log demonstrates that Simmons completed a higher number of files in three of the four months that his production numbers were counted as compared to Plaintiff. (R. 98, NHS's Rule 56.1 Resp. ¶ 16; R. 89-1, Ex. 3, 2011 Production Log at 18.) Specifically, Simmons completed more files than Plaintiff in September 2011 (39 files to Plaintiff's 30 files), October 2011 (50 files to Plaintiff's 43 files), and November 2011 (42 files to Plaintiff's 32 files); Plaintiff completed more files than Simmons in December 2011 (43 files to Simmons' 36 files). (R. 98, NHS's Rule 56.1 Resp. ¶ 16.)

Glenn and Coffey also considered Plaintiff's pattern of tardiness and communication issues. (*Id.* ¶ 36.) They did not believe that Plaintiff had sufficiently improved her communication skills in order to take on a role that required increased managerial responsibility. (*Id.*) Conversely, Glenn and Coffey found that Simmons was a consummate team player, had a positive attitude, and worked well with both his co-workers and supervisors. (*Id.* ¶ 37.)

In reaching a decision, Glenn also asked Site Manager Green for his feedback concerning the opening for the Counselor position. (R. 90, Pl.'s Rule 56.1 Resp. to FM ¶ 14.) Green advised Glenn that he believed that Simmons was best qualified for the position because "his performance metrics exceeded the other Intake Specialists." (*Id.*) Green further informed Glenn that Simmons' "collegial attitude best suited him for the customer-facing Counselor/Foreclosure Prevention Specialist position." (*Id.*) As a result of their own observations and the feedback from Green, Glenn and Coffey selected Simmons for the Counselor position. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 42.)

On February 7, 2012, Plaintiff e-mailed Fannie Mae's Program Manager Ludwig to request additional feedback as to what "[led him] to believe that [she] would not be a good fit for

8

the open counselor position." (*Id.* ¶ 43.) Plaintiff copied Glenn on this e-mail. (*Id.*) Ludwig forwarded Plaintiff's e-mail to Coffey that same day and expressed his desire that the NHS management team communicate to Plaintiff the reasons behind their decision with "clear transparency around [her] performance issues." (*Id.* ¶ 44.) On February 8, 2012, Plaintiff met with Glenn to discuss the e-mail she sent to Ludwig the day before. (R. 98, NHS's Rule 56.1 Resp. ¶ 19; R. 83-2, Ex. B Part 1, Pl.'s Dep. at 137:17-138:09.) Plaintiff requested this meeting because she felt that she needed to explain to Glenn the reason she e-mailed Ludwig, specifically that she felt that Ludwig "had some misinformation on [her]." (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 46; R. 83-2, Ex. B Part 1, Pl.'s Dep. at 140:09-23.) At the meeting, Glenn reviewed Plaintiff's personnel file, including the attendance and communication issues previously discussed. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 47.) Glenn told Plaintiff that "she did not feel that [Plaintiff] had established enough of a track record in [her] attendance and communication skills" to qualify her for a promotion to the Counselor position. (*Id.*; R. 83-2, Ex. B. Part 1, Pl.'s Dep. at 143:05-10.) Glenn further informed Plaintiff that it was not appropriate for her to have sent the February 7, 2012 e-mail to Ludwig. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 48.) Glenn was concerned because she had specifically directed Plaintiff to bring any issues Plaintiff had regarding Fannie Mae processes or procedures directly to her, rather than raise them first to Fannie Mae personnel. (*Id.* ¶ 45.) Glenn felt that the e-mail was contrary to her instructions. (*Id.*)

On February 14, 2012, Glenn prepared a rough draft of a Career Progression Plan "to aid [Plaintiff] in her professional development." (R. 98, NHS's Rule 56.1 Resp. ¶ 21; R. 89-3, Ex. 3, Career Progression Plan at 2-3.) The finalized document was sent to NHS's Human Resources Director Anderson via e-mail on February 27, 2012. (R. 98, NHS's Rule 56.1 Resp. ¶ 22; R. 89-

4, Ex. 4, Finalized Career Progression Plan at 2-4.) The Career Progression Plan outlined Plaintiff's current status regarding her areas for improvement and recommended a plan for her to apply to other counseling roles with the NHS office. (R. 98, NHS's Rule 56.1 Resp. ¶ 23; R. 89-4, Ex. 4, Finalized Career Progression Plan at 3.)

## IV.    Plaintiff's Internal Complaint

On February 24, 2012, Plaintiff scheduled a meeting with Anderson for February 27, 2012, to discuss her concerns regarding the hiring process for the Counselor position. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 49.) Plaintiff e-mailed Glenn on the day of the meeting to inform her that she was going to meet with Anderson. (*Id.* ¶ 50.) Plaintiff met with Anderson in Anderson's office at the NHS Central Office; only Plaintiff and Anderson were present at this meeting. (*Id.* ¶ 51.) Plaintiff told Anderson that she felt that she had been discriminated against based on her age and sex in not being selected for the Counselor position. (*Id.* ¶ 52.) Plaintiff also told Anderson that she believed that Simmons obtained the position because he spent time socially with Green. (*Id.* ¶ 53.) Plaintiff advised Anderson that she had scheduled an appointment with the Equal Employment Opportunity Commission ("EEOC") for later that week. (*Id.* ¶ 52.) Anderson told Plaintiff that she would be leaving town that week to attend a meeting in California, but that she would investigate Plaintiff's complaint. (*Id.* ¶ 54.) On February 28, 2012, Anderson had a telephone conversation with Glenn inquiring as to the reason why Plaintiff was not selected for the Counselor position. (*Id.* ¶ 55.) Glenn informed Anderson that Plaintiff's performance issues prevented her from being selected for the position. (*Id.*) Plaintiff did not overhear any part of the telephone conversation between Anderson and Glenn. (*Id.* ¶ 56.)

Anderson attests that she never informed Glenn, Coffey, or any other employee of NHS or Fannie Mae that Plaintiff had alleged that the promotion decision was discriminatory or that Plaintiff had an appointment with the EEOC; Glenn, Coffey, and Green all confirm that they had no knowledge of Plaintiff's internal complaint or EEOC appointment. (*Id.* ¶ 57.) Additionally, Plaintiff testified in her deposition that she had no personal knowledge that Anderson informed anyone at Fannie Mae about her complaint. (*Id.* ¶ 58.) Plaintiff further testified that she never complained to any supervisor or manager at NHS, aside from Anderson, that she believed that she had been discriminated against based on her age or sex in not being selected for the Counselor position. (*Id.* ¶ 59.) However, Plaintiff alleges that Anderson took notes during their meeting on February 27, 2012, and that Anderson created a file on her subsequent investigation of her discrimination complaint. (R. 98, NHS's Rule 56.1 Resp. ¶ 26.)

## V.    Plaintiff's "Voluntary Resignation" from NHS

Site Manager Green attests that after Simmons had been promoted to the Counselor position, he observed that Plaintiff's attitude continued to be confrontational. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 61.) He observed that Plaintiff "made inappropriate communications to co-workers and supervisors, resisted following her managers' instructions, and became increasingly disruptive to the work environment" at MHC. (*Id.*) Green attests that he was disappointed to learn about Plaintiff's e-mail to Ludwig because he was aware that Plaintiff had been counseled that she should raise any concerns to NHS personnel and not to Fannie Mae personnel. (*Id.* ¶ 62.) Green expressed his concerns about Plaintiff's demeanor, performance, and confrontational attitude to Glenn. (*Id.* ¶ 63.) Glenn and Coffey attest that based on the concerns raised by Green and other Fannie Mae personnel, and based on Glenn's own concerns about Plaintiff's demeanor, they determined that NHS could not continue to staff Plaintiff at MHC. (*Id.* ¶ 64.) In early

March 2012, Coffey informed Anderson that Plaintiff would be removed from MHC. (*Id.* ¶ 65.) Anderson had no involvement in the decision to remove Plaintiff, nor did Coffey or Glenn seek her input before making the decision. (*Id.* ¶ 66.)

On March 5, 2012, Anderson contacted Plaintiff and asked her to report to the NHS Central Office the following day. (*Id.* ¶ 67.) Beginning on March 6, 2012, Plaintiff reported to Anderson at the NHS Central Office and was assigned temporary tasks to perform, including assisting the Development Department with an upcoming dinner. (*Id.* ¶ 68.) Plaintiff continued to be paid at the same rate as an Intake Specialist. (*Id.*) On March 6, 2012, Plaintiff received a text message from Simmons saying how sorry he was to find out that she would not be working at MHC. (*Id.* ¶ 69; R. 98, NHS's Rule 56.1 Resp. ¶ 35.) The next day, Plaintiff asked Anderson about the message she received from Simmons, and Anderson confirmed that NHS had removed Plaintiff from the Fannie Mae contract. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 69.)

On March 12, 2012, Anderson informed Plaintiff that there were only two open positions at NHS: a Neighborhood Director position and an Administrative Assistant position. (*Id.* ¶ 71.) Anderson advised Plaintiff that she was not qualified for the Neighborhood Director position; nevertheless, Plaintiff applied for the position. (*Id.* ¶ 72.) On March 13, 2012, Anderson and Deborah Moore, NHS Associate Director of Neighborhood Strategy and Planning, interviewed Plaintiff for the Neighborhood Director position. (*Id.* ¶ 73.) The next day, Anderson informed Plaintiff that she had not been selected to interview further for the position,[3] and that the only remaining position was the Administrative Assistant position in NHS's West Humboldt Park office. (*Id.* ¶¶ 73, 76.) Anderson further explained to Plaintiff that if she refused to accept the Administrative Assistant position, she would be considered to have voluntarily resigned her

---

[3] Plaintiff is not alleging in this lawsuit that NHS's decision not to select her for the Neighborhood Director position was discriminatory. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 75.)

employment with NHS. (*Id.* ¶ 77.) Plaintiff declined the position because it paid $23,000 per year, which would have resulted in a 25 percent pay reduction, and required additional travel expenses to commute to the job location. (R. 98, NHS's Rule 56.1 Resp. ¶¶ 36, 39.)

Sometime after her meeting with Anderson on March 14, 2012, Plaintiff looked on NHS's website to see if there were any other positions open at NHS. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 79.) At the time, a Homeownership or Account Housing Counselor position and a Customer Service Representative position were open; however, Plaintiff did not apply for either position. (*Id.* ¶ 79.) Eventually, Plaintiff received a letter from Anderson dated April 3, 2012, confirming her voluntary resignation from NHS. (*Id.* ¶ 80.)

## PROCEDURAL HISTORY

Plaintiff initiated this action on December 19, 2012. (R. 1, Compl.) Plaintiff requested that counsel be appointed, (R. 4, Pl.'s Mot. for Counsel), and the Court granted her request on April 3, 2013, (R. 6, Min. Entry). Plaintiff's attorney later moved for relief from her appointment, (R. 29, Mot. for Relief ), and the Court granted counsel's motion and appointed a second counsel to represent Plaintiff, (R. 32, Order; R. 35, Min. Entry). However, due to a conflict of interest, Plaintiff's second counsel subsequently sought to withdraw, (R. 37, Mot. to Withdraw), and the Court granted counsel's motion and appointed Douglas M. Werman of Werman Law Office to represent Plaintiff on October 1, 2013, (R. 39, Order). On November 27, 2013, Plaintiff filed a four-count amended complaint. (R. 46, Am. Compl.) In Count I, Plaintiff alleges discrimination on the basis of age in violation of the ADEA, (*id.* ¶¶ 56-60); in Count II, she alleges discrimination on the basis of sex in violation of Title VII, (*id.* ¶¶ 61-65); in Count III, she alleges retaliation in violation of the ADEA, (*id.* ¶¶ 66-70); and in Count IV, she alleges retaliation in violation of Title VII, (*id.* ¶¶ 71-75). NHS answered Plaintiff's amended complaint

13

on December 23, 2013, (R. 47, NHS's Ans.), and Fannie Mae answered the complaint on December 24, 2014, (R. 48, FM's Ans.). Defendants separately moved for summary judgment on February 25, 2015. (R. 80, NHS's Mot. Summ. J.; R. 84, FM's Mot. Summ. J.) Plaintiff responded to both of Defendants' motions for summary judgment on May 1, 2015. (R. 88, Pl.'s Mem.) Defendants separately replied to Plaintiff's memorandum in opposition to summary judgment on May 29, 2015. (R. 96, NHS's Reply; R. 97, FM's Reply.)

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Id.* at 255; *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) ("[D]istrict courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record."). The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). The moving party "can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993).

14

Once the moving party has met this burden, the nonmoving party "must come forward with specific facts demonstrating that there is a genuine issue for trial." *Wheeler*, 539 F.3d at 634. "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Id.* (citing *Anderson*, 477 U.S. at 251-52). The nonmoving party may not rely on "mere conclusions and allegations" to create a genuinely disputed issue of material fact. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, the nonmoving party "must make a showing sufficient to establish any essential element of her cause of action for which she will bear the burden of persuasion at trial." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 425 (7th Cir. 1997); *see also Celotex*, 477 U.S. at 322-23. Weighing evidence and making credibility decisions are jury functions, and it is not appropriate for a judge to assume those functions when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 255. Accordingly, the Court "appl[ies] the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on issues of intent and credibility." *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002).

## ANALYSIS

### I.     Plaintiff's Age and Sex Discrimination Claims (Counts I and II)

In Counts I and II, Plaintiff alleges that, in failing to promote her to the Counselor position in February 2012, Defendants discriminated against her based on her age and sex in violation of the ADEA and Title VII. (R. 46, Am. Compl. ¶¶ 58-59, 63-64.) The ADEA forbids employers from discriminating against their employees "with respect to [their] compensation, terms, conditions, or privileges of employment" on the basis of age. 29 U.S.C. § 623(a)(1). Similarly, Title VII makes it unlawful for employers to discriminate against their employees on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). Discrimination claims under the ADEA and Title

VII are analyzed in the same manner, and this Court will therefore analyze both claims together. *See Hutt v. AbbVie Products, L.L.C.*, 757 F.3d 687, 691 (7th Cir. 2014); *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008).

A plaintiff may prove discrimination under the ADEA and Title VII through the direct or indirect methods of proof.[4] *Hutt*, 757 F.3d at 691 (citation omitted). A plaintiff may prevail under the direct method of proof either by presenting direct evidence of intentional discrimination or "by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). If a plaintiff relies on circumstantial evidence, the evidence "must directly point to a discriminatory reason for the employer's action[.]" *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 444 (7th Cir. 2014) (citation omitted). Circumstantial evidence that can form a convincing mosaic falls into three categories: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence that similarly situated employees outside the protected class received better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Hutt*, 757 F.3d at 691 (citation omitted). "Each type of evidence is

---

[4] The Supreme Court has held that to prevail under the ADEA, a plaintiff must show that age was the but-for cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009). Post-*Gross*, the Seventh Circuit continues to apply the direct and indirect methods when analyzing ADEA claims. *See Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012) ("we have continued to apply the *McDonnell Douglas* burden-shifting framework in summary judgment cases that proceed under the indirect method of proof, a question *Gross* explicitly left open"); *Hnizdor v. Pyramid Mouldings, Inc.*, 413 F. App'x 915, 917-18 (7th Cir. Mar. 1, 2011); *Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 498-99 (7th Cir. 2009) (applying the direct method of proof); *see also Yee v. UBS O'Connor, L.L.C.*, No. 07 C 7150, 2010 WL 1640192, at *17 (N.D. Ill. April 22, 2010) ("*Gross* did not equate the burden of proof in an ADEA case with the method of presenting that proof.").

sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Troupe*, 20 F.3d at 736.

A plaintiff that has failed to establish discriminatory intent under the direct method may nonetheless prevail under the indirect method of proof—the burden-shifting approach first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). Under the indirect method of proof, a plaintiff must first establish a *prima facie* case of discrimination, showing that: (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside of the protected class more favorably. *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014). Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for its actions. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014) (citation omitted). If the defendant satisfies its burden, the burden returns to the plaintiff to show that the defendant's proffered reason is a pretext for discrimination. *Id.* (citation omitted).

The Seventh Circuit has found that the second and third categories of circumstantial evidence under the direct method (the similarly situated inquiry and pretext inquiry) are similar to the required elements under the indirect method, and thus the Court's "analyses overlap." *Coleman v. Donahoe*, 667 F.3d 835, 860 n.8 (7th Cir. 2012) (quoting *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 851 (7th Cir. 2010)); *see also Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490-91 (7th Cir. 2007) (explaining that the indirect method "involves a subset of circumstantial evidence (including the disparate treatment of similarly situated employees)

that conforms to the prescription of [*McDonnell Douglas*]"); *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003) (explaining that the pretext category of circumstantial evidence under the direct method "is substantially the same as the evidence required under the indirect method" (internal quotation marks and citation omitted)). Ultimately, under either method, "the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Bass*, 746 F.3d at 840; *see also Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013).

Plaintiff seeks to avoid summary judgment on her discrimination claims via the direct method of proof by supplying circumstantial evidence. (R. 88, Pl.'s Mem. at 2-7.) Specifically, she argues that the facts give rise to an inference that Defendants' reasons for not promoting her are pretextual. (*Id.*) In order to successfully prove pretext, a plaintiff must put forth evidence demonstrating that "the employer's nondiscriminatory reason was dishonest" and that "the employer's true reason was based on a discriminatory intent." *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007) (citation omitted). A plaintiff "must show that the employer's reason is not credible or that the reason is factually baseless." *Id.*; *see also U.S. E.E.O.C. v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006) (a plaintiff can establish pretext "by presenting evidence that the employer's explanation was contrary to the facts, insufficient to justify the action or not truly the employer's motivation" (citation omitted)). A plaintiff fails to demonstrate pretext if the evidence shows that "the employer honestly believed the reasons it has offered[.]" *Coleman*, 667 F.3d at 852 (citation omitted). "It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proferred reason was pretextual, meaning that it was a lie." *Id.* (citation omitted); *see also Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 573 (7th Cir.

1998) (the court's "job is to determine whether the employer gave an honest explanation of its behavior[,]" and not to "sit as a super-personnel department that reexamines an entity's business decisions" (citation and internal quotation marks omitted)).

NHS provides three reasons for not selecting Plaintiff for the promotion to the Counselor position: (1) Plaintiff's pattern of tardiness; (2) her disrespectful communication style; and (3) her lower production numbers in comparison to Simmons'. (R. 96, NHS's Reply at 5.) The Court will address whether each of NHS's reasons is pretextual in turn.

A.   **Whether Plaintiff's tardiness is a pretextual reason for not promoting her**

NHS's first reason for not promoting Plaintiff is that she was consistently tardy. (*Id.* at 5-7.) Evans first met with Plaintiff in December 2010 to address Plaintiff's attendance issues after Plaintiff had been tardy to work on several occasions. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 14.) In April 2011, Glenn and Anderson met with Plaintiff after she had been tardy seven times in two months and reiterated NHS's expectations regarding attendance. (*Id.* ¶¶ 15-17.) Plaintiff was then tardy eight more times between April 2011 and October 2011. (*Id.* ¶ 18.) Consequently, Glenn met with Plaintiff again in October 2011 to remind Plaintiff of NHS's attendance policy and inform her that she would receive a written warning if her attendance issues continued. (*Id.* ¶¶ 19-20.)

Plaintiff admits that she had an attendance problem until April 2011, and admits that excluding the three days she was late with Glenn's prior approval, she was tardy five days between April 2011 and February 2012. (R. 88, Pl.'s Mem. at 3.) Even though Plaintiff characterizes her pattern of tardiness as "relatively minimal," she concedes that her tardiness alone would have been a sufficient reason for NHS to deny her the promotion. (*Id.*) Plaintiff offers no evidence to suggest that NHS's concerns over her attendance were factually baseless or

dishonest. Instead, Plaintiff argues that the pretextual nature of NHS's additional proffered

reasons undermines the legitimacy of its argument regarding her attendance. (*Id.*) However, to

defeat summary judgment, Plaintiff must show that *all* of NHS's proffered reasons are

pretextual. *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 754 (7th Cir. 2006) (where the

defendant offers several nondiscriminatory reasons, the plaintiff must "establish that each of the

defendants' reasons is pretextual" (citation omitted)); *Mills v. Health Care Servs. Corp.*, 171

F.3d 450, 459 (7th Cir. 1999) ("Because the defendant offered multiple reasons for its decision,

[plaintiff] must show that all were pretextual in order to reverse . . . summary judgment."

(citation omitted)). Plaintiff has offered no evidence from which a reasonable fact finder could

conclude that NHS's decision not to promote her based on her attendance issues was pretextual.

Accordingly, the Court finds that Plaintiff has failed to establish her discrimination claims under

either method of proof. Therefore, Plaintiff's claims fail as a matter of law. For the sake of

completeness, however, the Court will analyze whether Plaintiff has demonstrated that NHS's

other two reasons for not promoting her are pretextual.

### B.     Whether Plaintiff's disrespectful communication style is a pretextual reason for not promoting her

NHS's second reason for not promoting Plaintiff is its concern with her communication

skills. (R. 96, NHS's Reply at 5.) NHS provides four examples of instances where it believes

that Plaintiff exhibited a confrontational attitude. (*Id.* at 7-8.) The first instance occurred during

a December 2010 meeting, in which Plaintiff told Glenn that she "really didn't want to hear any

more about the action plan [the topic of the meeting] until they figured out how to really do it."

(R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 22.) The second instance occurred during a January 2011

meeting about their production goals, in which Plaintiff told Evans that she was not concerned

about the production goals for the Counselors because the Intake Specialists' production

numbers were good. (*Id.*) The third instance occurred during a February 2011 conversation between Plaintiff and Evans, in which they debated what to do with old client files. (*Id.*) The fourth instance occurred during a June 2011 conversation, in which Glenn denied Plaintiff her requested time off. (*Id.*)

Plaintiff does not dispute that all these instances occurred. (R. 88, Pl.'s Mem. at 3-5.) Rather, Plaintiff disagrees with Defendants' characterization of her attitude in each of these instances as being disrespectful or confrontational. (*Id.*) As to the February 2011 instance in particular, Plaintiff argues that it was "a normal discussion between manager and employee over how something should be done" that got "blown up into a confrontation, perhaps because Evans realized she should not be deleting files." (*Id.* at 5.) However, the question is not whether Plaintiff's attitude was actually disrespectful or confrontational, but rather whether NHS honestly believed that she was disrespectful. *See Coleman*, 667 F.3d at 852; *Holshouser v. Abbott Labs.*, 31 F. Supp. 3d 964, 971-72 (N.D. Ill. 2014) ("It is well-settled in this Circuit and others that, where an employer honestly believes the reasons provided for a termination, a plaintiff cannot establish pretext, even if those reasons were wrongheaded in some manner."); *Strickert v. Wicker World Enters., Inc.*, No. 96 C 7955, 1998 WL 456546, at *7 (N.D. Ill. July 31, 1998) (key issue with regard to plaintiff's discrimination claim was "not simply whether [his] inappropriate behavior actually occurred, but whether [his employer] honestly believed that it occurred").

Plaintiff offers no evidence to demonstrate that Glenn and Evans did not honestly believe that Plaintiff was being disrespectful in these four instances. In fact, the evidence shows that Evans and Glenn did indeed think that Plaintiff acted inappropriately and communicated their concerns to Plaintiff. Immediately after the February 2011 incident, Evans and Plaintiff both met with Glenn, and Evans told Glenn that she believed that Plaintiff was challenging her authority.

21

(R. 98, NHS's Rule 56.1 Resp. ¶ 11.) Plaintiff admits that after this conversation, she understood that Evans believed that she had been insubordinate. (*Id.*) Glenn also met with Plaintiff in July 2011 to discuss all four instances. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 23.) At this meeting, Glenn informed Plaintiff that she did not feel that Plaintiff respected her as a supervisor and counseled Plaintiff on the need to improve her communication skills. (*Id.*) Glenn also warned Plaintiff of Ludwig's concern about her attitude. (*Id.* ¶ 24.) Glenn reiterated these concerns in Plaintiff's December 2011 performance review, reminding Plaintiff that she needed "to understand that attendance and being tactful in her communication is just as critical to her success as the other measures." (R. 98, NHS's Rule 56.1 Resp. ¶ 14.) Glenn and Evans therefore communicated to Plaintiff their concerns regarding her attitude well before Plaintiff applied for the Counselor position in February 2012. Plaintiff has presented no evidence from which a reasonable trier of fact could infer that NHS did not honestly believe that Plaintiff's communication issues made her unqualified for the Counselor position. Accordingly, the Court finds that Plaintiff is unable to demonstrate that NHS's decision not to promote Plaintiff because of her attitude was a pretext for age or sex discrimination. *See David v. Donahoe*, No. 11 C 3720, 2013 WL 676243, at *9-*10 (N.D. Ill. Feb. 25, 2013) (finding that plaintiff failed to establish pretext because she provided no evidence that defendant did not honestly believe that she falsified employee time entries or that demoting her for that belief was inappropriate); *Alexander v. Cit Tech. Fin. Servs., Inc.*, 217 F. Supp. 2d 867, 890 (N.D. Ill. 2002) (finding that plaintiff failed to establish pretext because her "interpretations of incidents or her denials that they ever occurred do not address whether [her employer] honestly believed that [she] was insubordinate and threatening").

**C.    Whether Simmons' superior performance as an Intake Specialist is a
prextual reason for not promoting Plaintiff**

NHS's third reason for not promoting Plaintiff is that it believed that Simmons was more

qualified for the position based on his performance as an Intake Specialist. (R. 96, NHS's Reply

at 11.) Simmons began working as an Intake Specialist at MHC in May 2011; his production

numbers were recorded beginning September 2011. (R. 98, NHS's Rule 56.1 Resp. ¶ 16.)

During the period of 2011 where both their production numbers were recorded, Simmons

completed more files than Plaintiff in three of the four months. (*Id.*) Additionally, despite

joining MHC in May, Simmons handled a total of 5,732 calls in 2011, whereas Plaintiff handled

a total of 3,982 calls. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 34.)

Plaintiff argues that Defendants "cherry-picked production numbers in an effort to show

that Simmons, during his relatively brief tenure, was better qualified." (R. 88, Pl.'s Mem. at 6.)

Plaintiff asserts that she had the highest submission of completed files for the entire 2011 year,

averaging 44 per month compared to Simmons' 41.75 per month. (*Id.*) However, as Fannie Mae

points out, Plaintiff was the only Intake Specialist that worked the entire year. (R. 97, FM's

Mem. at 4.) Comparing Plaintiff against Simmons for the period in 2011 that they both worked,

Plaintiff averaged only 37 completed files per month against Simmons' 41.75. (*Id.*) Plaintiff

also contends that Defendants' focus on phone calls is "misplaced." (R. 88, Pl.'s Mem. at 7.)

According to Plaintiff, from Simmons' initial hire in May 2011 through December 2011, he

served half his time as an Administrative Assistant, answering incoming phone calls, and half his

time as an Intake Specialist, reviewing documents and completing files for submission to

Counselors. (R. 88, Pl.'s Mem. at 7.) Plaintiff asserts that this accounts for Simmons' high

phone volume compared to herself and Hicks, who worked only as Intake Specialists and had

limited receptionist responsibility. (*Id.*) However, Plaintiff provides no evidentiary support,

other than her own affidavit, for the assertion that she and Simmons performed different duties. (R. 98, NHS' Rule 56.1 Resp. ¶ 18.)

Additionally, Plaintiff points to her December 2011 performance review to support her argument that she was qualified for the Counselor position. (R. 88, Pl.'s Mem. at 6.) In her review, Plaintiff received an overall Manager Appraisal Score of 3.9 out of a possible score of 5.0. (R. 98, NHS's Rule 56.1 Resp. ¶ 14.) For the Core Factors of Achievement, Productivity/Time Management, and Accountability she received an Exceeds Performance Measure. (*Id.*) As to the Achievement factor, Glenn noted that Plaintiff "has played an [sic] significant role in our production relating to the number of files complete[d]" and that she "managed our intake files independently for the months of January and February." (*Id.*) Glenn also noted that from January 2011 to June 2011, Plaintiff's average number of completed files "exceeded her peers." (*Id.*)

Plaintiff argues that NHS's decision to promote Simmons based in part on his performance must be a lie because the evidence demonstrates that she was just as qualified for the position. (R. 88, Pl.'s Mem. at 7.) However, Plaintiff cannot establish pretext by simply arguing that NHS was mistaken about its assessment of her performance relative to Simmons' performance, or that NHS's decision was wrong. *See Coleman*, 667 F.3d at 852; *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 900 (7th Cir. 1999) ("It is 'a distraction' for [plaintiff] to argue about the accuracy of [defendant's] assessment of her involvement in the alleged behavior because that is not the determinative issue."). The Court "does not sit as a super personnel department to review an employer's business decisions." *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000). Plaintiff must prove that NHS's proffered reason "was a lie, and not merely a mistake," *id.*, and Plaintiff has failed to meet her burden. She has offered

no evidence to refute NHS's contention that Glenn and Coffey honestly believed after reviewing the production numbers that Simmons was more qualified for the position based on his performance. *See id.* ("[Plaintiff's] attack on the way [his employer] calculated his sales figures gets him nowhere as long as the company's reliance on those calculations was in good faith."). Therefore, Plaintiff has failed to provide sufficient evidence from which a reasonable fact finder can infer that NHS's decision to promote Simmons based on his performance was pretextual.

Accordingly, Plaintiff cannot establish that any of NHS's proffered reasons for not promoting her are pretext for age or sex discrimination. Plaintiff has thus failed to prove her claims under either the direct or indirect method. The Court therefore concludes that Plaintiff's discrimination claims fail as a matter of law, and that Defendants are entitled to summary judgment on these claims.

## II.    Plaintiff's Retaliation Claims (Counts III and IV)

In Counts III and IV, Plaintiff alleges that Defendants retaliated against her in violation of the ADEA and Title VII for filing an internal complaint of discrimination with NHS's human resources department. (R. 46, Am. Compl. ¶¶ 66-70,72-75.) As with discrimination claims, a plaintiff may establish retaliation claims by way of either the direct or indirect method. *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012) (citation omitted); *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011).[5] Here, Plaintiff seeks to prove her retaliation claims by way of the direct method. (R. 88, Pl.'s Mem. at 7.) To prevail using this method, Plaintiff must present evidence, direct or circumstantial, showing that: (1) she engaged in a statutorily protected activity; (2) she was subjected to an adverse employment

---

[5] The analysis for retaliation claims is the same under the ADEA and Title VII. *See Smith*, 674 F.3d at 657; *Silverman*, 637 F.3d at 740. The Court thus cites relevant case law interchangeably.

action; and (3) a causal connection exists between the two. *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015) (citation omitted).[6]

The parties do not dispute that Plaintiff engaged in a protected activity when she filed an internal complaint with Anderson on February 27, 2012. (R. 82, NHS's Mem. at 13; R. 88, Pl.'s Mem. at 8.) As to the second element, Plaintiff alleges that she suffered two adverse employment actions in retaliation for filing her internal complaint: (1) Defendants removed her from her position at MHC on March 6, 2012; and (2) NHS constructively discharged her. (R. 88, Pl.'s Mem. at 8, 14-15.) NHS concedes that Plaintiff's removal from her position at MHC was an adverse employment action. (R. 96, NHS's Reply at 15.) However, NHS disputes that Plaintiff was constructively discharged. (*Id.*) NHS argues that Plaintiff voluntarily resigned and that her voluntary resignation does not constitute an adverse employment action "separate and apart from NHS' decision to remove her from the MHC." (*Id.*)

"The term 'constructive discharge' refers to the situation in which an employer, without firing an employee, makes his working conditions so miserable that it drives him to quit." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 655 (7th Cir. 2000). To prove constructive discharge, a plaintiff must show that her "working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). "Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment[.]" *Id.* "[U]nless conditions are beyond 'ordinary' discrimination, a complaining

---

[6] To establish a *prima facie* case of retaliation under the indirect method, Plaintiff must satisfy the first two elements of the direct method and further show that: (1) she was meeting the employer's legitimate expectations; and (2) she was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity. *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 883 (7th Cir. 2014). Plaintiff does not offer any evidence to prove retaliation via the indirect method.

employee is expected to remain on the job while seeking redress." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997).

Plaintiff argues that she was constructively discharged because the administrative position NHS offered her would have resulted in a 25 percent pay reduction that she could not afford and represented a "lack of further career advancement." (R. 88, Pl.'s Mem. at 15.) Plaintiff contends that her situation is similar to that of the plaintiff in *Hunt*. (*Id.*) In that case, a white male police officer claimed that he was constructively discharged because he was forced to resign after being told by the predominantly black municipal administration that he had no future in the police department. *Hunt*, 219 F.3d at 652. The Seventh Circuit reversed the district court's grant of summary judgment on this claim, holding that "[a] person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." *Id.* at 655. The Court finds the present case distinguishable from *Hunt*. Unlike the police officer in *Hunt*, Plaintiff was never told that she had no future at NHS. Plaintiff has presented no evidence to suggest that if she accepted the available administrative position, she would not subsequently have the opportunity to move into a different, higher paying position at NHS. While the Court recognizes that accepting the administrative position was not preferable to Plaintiff because of the reduction in pay and the increased travel expenses, her situation does not rise to the level of being intolerable. *See Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 877 (7th Cir. 1999) (providing examples of intolerable working conditions, such as "a work environment where a subordinate's disputed sexual relationship with her supervisor led to a suicide attempt"). The Court therefore finds that Plaintiff has not proven that she was constructively discharged.

Plaintiff understood that by declining NHS's offer of the administrative position, she was voluntarily resigning her employment with NHS. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 77.) "In the absence of circumstances suggesting a constructive discharge, an employee who voluntarily resigns cannot be said to have experienced an adverse employment action." *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 235 (7th Cir. 2014). Accordingly, the Court finds that the only adverse employment action Plaintiff suffered was her removal from MHC.

To satisfy the third element of the direct method, Plaintiff must show that there was a causal link between her internal complaint and her removal from MHC. *See Greengrass*, 776 F.3d at 485. To establish a causal link, a plaintiff must establish that her internal complaint was the "but-for cause" of an adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013); *see also Greengrass*, 776 F.3d at 486 ("To demonstrate a 'causal link' between the protected activity and the adverse employment action, a plaintiff must show the defendant would not have taken the adverse action but for her protected activity." (citation and internal alterations and quotation marks omitted)). In other words, to survive summary judgment, a plaintiff needs to provide enough direct or circumstantial evidence to allow a jury to conclude that she suffered an adverse employment action because of her statutorily protected activity. *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013); *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 709 (7th Cir. 2011).

As an initial matter, Defendants argue that Plaintiff cannot prove a causal connection because there is no evidence that the individuals who made the decision to remove Plaintiff from MHC—Coffey and Glenn—had knowledge of her internal discrimination complaint at the time of that decision. (R. 96, NHS's Reply at 12-14; R. 97, FM's Reply at 6-7.) Plaintiff argues that there are fact questions as to whether Anderson informed others at NHS and Fannie Mae about

28

Plaintiff's discrimination complaint. (R. 88, Pl.'s Mem. at 10-13.) Plaintiff contends that Anderson took notes during their meeting on February 27, 2012, and that Anderson later told Plaintiff that she created a file on her subsequent investigation of Plaintiff's discrimination complaint. (*Id.* at 11.) Anderson explained to Plaintiff that she left this file in her office when her employment with NHS was terminated. (*Id.*) According to Plaintiff, this file would have confirmed whether Anderson informed anyone at NHS or Fannie Mae of Plaintiff's complaint during the course of investigating that complaint. (*Id.*) However, NHS failed to produce Anderson's notes and investigation file in response to Plaintiff's discovery requests. (*Id.*) Plaintiff thus argues that "the missing notes and file creates an adverse inference and a fact question" as to Defendants' claimed ignorance of the discrimination complaint. (*Id.*) NHS counters that after conducting an exhaustive search, it produced all documents responsive to Plaintiff's discovery requests. (R. 98, NHS's Rule 56.1. Resp. ¶ 28.) NHS also correctly asserts that Plaintiff's testimony that Anderson told her that she created a file regarding her complaint is inadmissible hearsay. (R. 96, NHS's Reply at 13.) *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial" (citation omitted)).

Even if the Court assumes that Anderson created a file, Plaintiff has provided no evidence that the file would include proof that Anderson informed Glenn, Coffey, or Green of Plaintiff's complaint. Plaintiff testified that she never complained about discrimination to any supervisor or manager at NHS aside from Anderson, and that she had no personal knowledge that Anderson actually informed anyone about her complaint. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶¶ 58-59.) Anderson attests in her affidavit that she never informed Glenn, Coffey, or any other employee of NHS or Fannie Mae that Plaintiff had alleged that the promotion decision was

discriminatory, or that Plaintiff had an appointment with the EEOC. (R. 83-5, Ex. D, Anderson Aff. ¶¶ 6-7.) Additionally, Glenn, Coffey, and Green all attest in their affidavits that they were not informed by anyone at any time during Plaintiff's employment that she had complained of discrimination and made an EEOC appointment. (83-1, Ex. A, Coffey Aff. ¶ 13; R. 83-4, Ex. C, Glenn Aff. ¶¶ 15-16; R. 83-6, Ex. E, Green Aff. ¶ 12.) Plaintiff has not refuted this testimony with any evidence. Thus, Plaintiff's argument that Glenn and Coffey must have known about Plaintiff's internal complaint is based solely on speculation. While the Court construes the facts in favor of the nonmoving party on summary judgement, that favor "does not extend to drawing inferences that are supported by only speculation or conjecture." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation and internal alterations and quotation marks omitted). The Court therefore finds that Plaintiff has not provided sufficient evidence to create a genuine factual dispute as to Coffey's and Glenn's ignorance of Plaintiff's internal complaint. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) (affirming grant of summary judgment on plaintiffs' retaliation claim because "plaintiffs' argument for retaliatory animus relie[d] entirely on speculation" and "[n]o affirmative evidence suggest[ed] that the decision-makers were even *aware* of the plaintiffs' discrimination complaints before they denied the transfers, much less that they did so intending to retaliate against the plaintiffs"); *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1121-22 (7th Cir. 2009) (finding that plaintiff's retaliation claim failed because he presented no evidence that his supervisor was aware of his EEOC charges at the time of his suspension and thus he could not establish a causal link).

Regardless, even if the Court assumes that Coffey and Glenn knew about Plaintiff's internal complaint, Plaintiff must still prove that they removed her from her position at MHC because she filed the internal complaint. *See Hobgood*, 731 F.3d at 643; *Brown*, 700 F.3d at

1108 ("the plaintiffs must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have"). Plaintiff attempts to establish this casual connection by providing circumstantial evidence of suspicious timing and pretext. (R. 88, Pl.'s Mem. at 7-10.) First, Plaintiff argues that because her removal from MHC came just eight days after she filed her internal complaint, the Court should infer a causal link between the two events. (R. 88, Pl.'s Mem. at 8.) "[T]emporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *Coleman*, 667 F.3d at 860 (citation omitted). "When temporal proximity is one among several tiles in an evidentiary mosaic depicting retaliatory motive, however, suspicious timing can sometimes raise an inference of a causal connection." *Id.* (citation and internal alterations and quotation marks omitted); *see also Lang v. Ill. Dep't of Children and Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link." (internal citation omitted)).

Plaintiff also argues that there is evidence that NHS's purported reason for her removal is pretextual. (R. 88, Pl.'s Mem. at 8.) According to Plaintiff, Coffey and Glenn removed her from MHC because of her February 7, 2012 e-mail to Ludwig. (*Id.*) Plaintiff contends that this purported reason is pretextual because she was never reprimanded for sending the e-mail and her Career Progression Plan did not include the e-mail as a specific example of improper communication. (*Id.* at 8-9.) In Plaintiff's opinion, the e-mail was "a minor issue," and Coffey only "developed a renewed interest" in the e-mail after NHS had already decided to remove her from MHC. (*Id.* at 9-10.)

Plaintiff incorrectly assumes that NHS's purported reason for her removal from MHC was her e-mail to Ludwig. Both Coffey and Glenn attest in their affidavits that they removed Plaintiff because of concerns regarding her performance and attitude that were raised by Green, Glenn, and other Fannie Mae personnel. (R. 83-1, Ex. A, Coffey Aff. ¶ 10; R. 83-4, Ex. C, Glenn Aff. ¶ 12.) They include Plaintiff's e-mail as one specific example for why they were concerned about Plaintiff's attitude, but they do not state that her e-mail was the sole basis for their decision. (R. 83-1, Ex. A, Coffey Aff. ¶ 10; R. 83-4, Ex. C, Glenn Aff. ¶ 12.) As explained above, Plaintiff has provided no evidence to suggest that Coffey and Glenn did not honestly believe that Plaintiff had communication issues. Nor has Plaintiff provided evidence that Coffey and Glenn did not honestly believe that Plaintiff's performance and attitude necessitated her removal from MHC. Further, while Plaintiff may believe that her e-mail to Ludwig was only "a minor issue," the evidence shows that Glenn was concerned about the e-mail. Glenn attests that she was concerned about the e-mail because she had specifically directed Plaintiff to bring any issues she had regarding Fannie Mae processes or procedures directly to her, rather than to raise them with Fannie Mae personnel. (R. 83-4, Ex. C, Glenn Aff. ¶ 10.) Glenn also attests that she discussed with Plaintiff why she believed the e-mail was inappropriate at their February 8, 2012 meeting. (*Id.* ¶ 11.) Plaintiff admitted in her deposition that during that meeting, Glenn appeared to be "unhappy" about the e-mail. (R. 91, Pl.'s Rule 56.1 Resp. to NHS ¶ 48.)

Finally, the fact that Plaintiff's Career Progression Plan did not mention the e-mail is of no consequence. Glenn submitted the final draft of Plaintiff's Career Progression Plan to Anderson on the same day Plaintiff filed her internal complaint. (R. 98, NHS's Rule 56.1 Resp. ¶ 22.) The Career Progression Plan outlined Plaintiff's current status regarding her areas for improvement in attendance and communication. (R. 89-4, Ex. 4, Finalized Career Progression

Plan at 2-4.) The Plan noted that Plaintiff struggled with her communication skills, providing her June 2011 encounter with Glenn regarding her requested time off as one example. (*Id.* at 3.) The Plan recommended that Plaintiff focus on "conflict management" and on approaching others "in a tactful manner." (*Id.* at 4.) The Plan thus further confirms that Glenn was concerned about Plaintiff's attitude before Plaintiff filed her internal complaint. The Court therefore cannot find that the Plan is evidence that Glenn's and Coffey's decision to remove her from MHC based on her attitude is pretextual.

Accordingly, Plaintiff has not provided sufficient circumstantial evidence to allow a reasonable jury to conclude that NHS removed her from her position at MHC because she filed an internal complaint. Because Plaintiff has not established the causation requirement, her retaliation claims fail as a matter of law. Therefore, the Court finds that Defendants are entitled to summary judgment on these claims.[7]

---

[7] Fannie Mae also argues that it had no involvement in NHS's decision to select Simmons for the Counselor position or NHS's decision to remove Plaintiff from MHC, and thus it cannot be held liable under the ADEA or Title VII. (R. 86, FM's Mem. at 10, 13-14.) Because the Court has found that Plaintiff failed to establish her discrimination and retaliation claims, the Court need not address the extent of Fannie Mae's liability.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment (R. 80; R. 84) are GRANTED. The Clerk of the Court is directed to enter a final judgment in favor of Defendants Neighborhood Housing Services of Chicago and Fannie Mae.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: September 10, 2015**